

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

EN:AH

271 Cadman Plaza East
Brooklyn, New York 11201

July 27, 2012

**By Hand and ECF**

The Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

              Re:  United States v. Abram Morduhaev
                   Criminal Docket No. 07-606 (BMC)

Dear Judge Cogan:

          The government respectfully submits this letter in response to the defendant Abram Morduhaev's sentencing letter dated July 20, 2012 ("Def.'s Ltr"), in which he seeks a below Guidelines, non-custodial sentence.  For the reasons set forth below, the government requests that the Court impose a period of custodial incarceration.  Sentencing is scheduled for August 3, 2012 at 11:30 a.m.

                            BACKGROUND

          The defendant pled guilty on February 15, 2008, pursuant to a plea agreement, to one count of conspiring to sell, exchange, transfer, receive, and deliver false, forged, and counterfeited United States currency with the intent that the same be passed, published, and used as true and genuine, in violation of 18 U.S.C. § 473.  The Probation Department thereafter prepared a Pre-Sentence Investigation Report ("PSR") that calculated the defendant's United States Sentencing Guidelines ("U.S.S.G" or "Guidelines") range of imprisonment to be 41 to 51 months, which is based on an offense level of 22 and a criminal history category of I.  PSR ¶ 60.

          The Guidelines range applicable to the defendant is largely based on the dollar amount of counterfeit United States currency ("counterfeit currency") that he distributed and attempted to distribute.  U.S.S.G. § 2B5.1(b)(1)(B).  As stated in the PSR, during the course of the investigation, the defendant distributed $308,950 in counterfeit currency to an undercover

agent during three separate transactions between June 5 and June
28, 2007.  PSR ¶¶ 4-6, 10.  In addition, during a June 27, 2007
meeting ("June 27 meeting") between the undercover agent, the
defendant and co-defendant Boris Molkandow that occurred at an
apartment the defendant shared with his father and co-conspirator
Arkadi Morduhaev, Molkandow showed the undercover $100,000 in
counterfeit currency that was counted during the meeting.  PSR
¶ 9.  Also during the June 27 meeting, the defendant showed the
undercover a plastic bag that the defendant represented contained
$900,000 in counterfeit currency, although that currency was not
counted during the meeting.  Id.  No purchase was made by the
undercover during the June 27 meeting, however, because the
defendant and Molkandow were unable to produce the $7.5 million
in counterfeit currency that they had previously told the
undercover would be available for purchase.  PSR ¶ 7.

        Based on the above stated facts, the Probation
Department concluded that the defendant was responsible for
$1,208,950 million in counterfeit currency, which includes the
$308,950 in counterfeit currency he distributed plus the $900,000
he represented was contained in the bag he presented to the
undercover.[1]  PSR ¶ 12.  This amount of counterfeit currency
results in a 16-level enhancement to the defendant's offense
level pursuant to U.S.S.G. § 2B1.1(b)(1)(I).  PSR ¶ 19.

                        ARGUMENT

I.    The Advisory Guideline Range

        The defendant objects to the inclusion of a 16-level
enhancement in the Guidelines range as calculated by Probation
Department for distribution of $1,208,950 in counterfeit currency
pursuant to U.S.S.G. § 2B1.1(b)(1)(I).  The defendant asserts
that "the parties acknowledged and agreed that the value of the
counterfeit currency Mr. Morduhaev was criminally responsible for
was more than $200,000 but less than $400,000" in the defendant's
plea agreement - i.e., resulting in a 12-level enhancement rather
than the 16-level enhancement found by the Probation Department.
See Def.'s Ltr at 1.

        As an initial matter, while the plea agreement does not
include an agreement by the government regarding the amount of
counterfeit currency the defendant distributed and attempted to

_____

        [1]   The Probation Department did not include the $100,000
in counterfeit currency that was counted during the June 27
meeting in this calculation.

distribute for purposes of the Guidelines, the plea agreement did include an estimate by the government that the offense level applicable to the defendant would be based on an amount of counterfeit currency between $200,000 and $400,000, which results in a 12-level upward enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(G), as opposed to the 16-level enhancement calculated by the Probation Department, which corresponds to an amount of counterfeit currency between $1,000,000 and $2,500,000, see U.S.S.G. § 2B1.1(b)(1)(I).  The plea agreement also included a stipulation by the defendant that "he possessed more than $200,000 in counterfeit United States currency."  See Plea Agreement at ¶ 2.

While the rationale supporting the 12-level estimate in the plea agreement is not entirely clear, it appears likely that the estimate was based on the $308,950 in counterfeit currency the defendant possessed, see PSR ¶¶ 4-6, 10, during the course of the investigation.  The government is not able to prove that the defendant in fact possessed $900,000 in counterfeit currency in the bag he presented to the undercover agent during the June 27 meeting (because the counterfeit currency was neither seized nor counted in front of the undercover agent), and the government does not believe the defendant should be held accountable for that amount.  Also, as previously noted, see footnote 1, the Probation Department did not hold the defendant accountable for the $100,000 in counterfeit currency that was counted during the June 27 meeting.  It appears that this amount was also not included in the government's estimate provided in the plea agreement as its inclusion would have presumably resulted in a 14-level enhancement.  Under the circumstances, while it may have been proper to take the $100,000 into account, the government stands by its original estimate in the plea agreement.

As such, pursuant to Guidelines § 2B1.1(b)(1)(G), 12 levels should be added to the base offense level of 9, see Guidelines § 2B5.1(a), resulting in a total offense level of 18 once three levels are subtracted for acceptance of responsibility pursuant to Guidelines § 3E1.1.  Because the total offense level is 18 and the defendant is in criminal history category I, the applicable Guidelines range is 27 to 33 months' imprisonment.

II.   The Court Should Sentence the Defendant to a Period of Custodial Incarceration

Regardless of the applicable Guidelines range, the defendant requests a non-custodial – i.e., below Guidelines – sentence primarily on the basis of the significant medical conditions he has suffered historically, his age at the time of

the offense, and the fact that he was under the influence of his father, who was also involved in the same criminal activity but fled to Israel and is currently a fugitive. See Def.'s Ltr at 2-8. While the Court can, and should, take these factors into account pursuant to 18 U.S.C. § 3553(a), the government respectfully submits that a sentence that includes a period of incarceration is nonetheless appropriate and warranted in this case.

    A.    <u>Nature and Circumstances of the Offense</u>

       The defendant pled guilty to a serious offense that required concerted and calculated acts to repeatedly distribute substantial sums of counterfeit money. This was not a one-time incident; rather, the defendant participated in multiple sales of counterfeit currency in significant amounts, with the apparent intent and ability to participate in even more significant transactions. See PSR ¶¶ 4-10.

    B.    <u>History and Characteristics of the Defendant</u>

       The government recognizes that this defendant has endured a significant health condition. As detailed in his letter, the defendant was diagnosed with a rare form of bone cancer in 2007, which, after lengthy and debilitating treatment that included chemotherapy, is now in remission. Def.'s Ltr. at 5; PSR ¶¶ 41, 42.

       Section 5H1.4 of the Guidelines makes clear that "[p]hysical condition . . . is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." As the Second Circuit has observed, however, a condition that renders a defendant "seriously infirm" may be sufficient to warrant a departure. <u>United States v. Altman</u>, 48 F.3d 96, 104 (2d Cir. 1995). Elaborating on this standard, the <u>Altman</u> court suggested that a downward departure under Section 5H1.4 is not warranted unless the defendant is seriously infirm with a medical condition that cannot be cared for adequately by the Bureau of Prisons. <u>See id.</u>; <u>see also</u> U.S.S.G. § 5H1. While the defendant has clearly suffered serious medical ailments historically, there is currently no indication that the Bureau of Prisons would be unable to adequately monitor the defendant. <u>See</u> PSR ¶42 (noting that the defendant's physical indicated that he is "currently stable" but requires monitoring every six months). Accordingly, the defendant's motion for a non-custodial sentence

on the basis of his medical condition should be denied.[2]

This Court may, however, consider the totality of the defendant's circumstances, including his age at the time of the offense and his position vis-a-vis his father, who was also part of the conspiracy but has remained a fugitive throughout both his son's prosecution and struggle with cancer, in imposing a reasonable sentence in this case.  Based on these factors, the government does not disagree that a below Guidelines sentence is appropriate.

C.   The Need for a Sentence of Custodial Incarceration

Given the nature of the crime to which the defendant pled guilty, as well as the level of the defendant's participation in that crime, a period of incarceration is appropriate here to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).

---

[2]   The defendant also suggests that the Court should take into account the fact that he has no prior criminal history in finding that a non-custodial sentence is appropriate.  See Def.'s Ltr at 2.  The fact that he is a first-time offender, however, has already been taken into account by the Guidelines because his sentence is based on a Criminal History Category of I.  Thus, the fact that the defendant does not have a prior criminal history ought not be considered as a mitigating factor when imposing sentence.  See, e.g., United States v. Meiners, 485 F.3d 1211 (9th Cir. 2007) (rejecting first time offender's Eighth Amendment challenge to his 15 year sentence for sex offenses).  Moreover, although the defendant does not have a prior criminal record, his history with respect to this scheme indicates that his disregard for the law was consistent and repetitive, and his participation involved significant planning.

6

<u>CONCLUSION</u>

For the foregoing reasons, the defendant should be sentenced to a period of custodial incarceration.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney


By:  /s/ Amanda Hector
     Amanda Hector
     Assistant U.S. Attorney


cc:  Steven Brounstein, Esq. (by ECF)
     Clerk of Court (BMC) (by ECF)